720 F.2d 142
 19 ERC 2009, 231 U.S.App.D.C. 378, 13
Envtl. L. Rep. 21,069
 AUTOMOTIVE PARTS REBUILDERS ASSOCIATION, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Automotive Service Industry Association, Intervenor.
MOTOR VEHICLE MANUFACTURERS ASSOCIATION OF the UNITED
STATES, INC., et al., Petitioners,
v.
William D. RUCKELSHAUS, Administrator, United States
Environmental Protection Agency, Respondent,
Automobile Importers of America, Inc., Intervenor.
 Nos. 80-1788, 80-1828.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 9, 1983.
Decided Oct. 14, 1983.
 
 Petitions for Review of Final Regulations Promulgated by the Environmental Protection Agency.
 Louis F. Marchese, Chicago, Ill., and Richard A. Mehler, Washington, D.C., with whom Harold T. Halfpenny and James F. Flanagan, Chicago, Ill., Patrick J. Moran and David J. Frantz, Washington, D.C., were on the joint brief, for petitioner and intervenor in No. 80-1788.
 Theodore Souris, with whom James A. Smith, David G. Chardavoyne, William H. Crabtree, Charles H. Lockwood, Michael W. Grice, William L. Weber, Terrence B. Larkin, Frederick J. Dindoff, George F. Ball, Detroit, Mich., Thomas L. Saybolt, Paula Winkler-Doman, Dearborn, Mich., Kenneth I. Gluckman, Southfied, Mich., Milton D. Andrews, Alden J. Bianchi, and Lance E. Tunick,, Washington, D.C., Gerhard P. Riechel, Englewood Cliffs, N.J., were on the joint brief, for petitioners and intervenor in No. 80-1828.
 David Earl Dearing, Attorney, Dept. of Justice, Washington, D.C., with whom Angus MacBeth, Deputy Asst. Atty. Gen., Robert M. Perry, Gen. Counsel, E.P.A., and Donald W. Stever, Jr., Attorney, E.P.A., Washington, D.C., were on the brief, for respondent. Samuel I. Gutter, Attorney, E.P.A., Washington, D.C., entered an appearance for respondent.
 Thomas Y. Au, Asst. Atty. Gen., Com. of Pa., Harrisburg, Pa., with whom Robert Abrams, Atty. Gen., State of N.Y., Marcia J. Cleveland, Asst. Atty. Gen., and David R. Wooley, Sp. Asst. Atty. Gen., State of N.Y., New York City, Francis X. Bellotti, Atty. Gen., Com. of Mass., and Stephen M. Leonard, Asst. Atty. Gen., Com. of Mass., Boston, Mass., were on the joint brief, for amici curiae, urging dismissal.
 Before WRIGHT and MIKVA, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 In Section 207(b) of the 1970 Clean Air Act amendments, 42 U.S.C. Sec. 7541(b) (Supp. V 1981) (the Act), Congress first required vehicle manufacturers to warrant that their vehicles will perform in accordance with applicable emission standards throughout their useful lives. For any vehicle that does not comply, the performance warranty requires the manufacturer, instead of the vehicle owner, to pay for such repairs as will bring the vehicle into compliance with applicable emission standards. In 1977 Congress revised Section 207(b) to offset the anticompetitive effects this warranty would have on the aftermarket parts industry.[1] Congress instructed the Administrator of the Environmental Protection Agency (EPA) to promulgate any regulations necessary for effective implementation of this revised performance warranty scheme. The Administrator promulgated such regulations in 1980.
 
 
 2
 In this case we review a consolidated set of petitions brought by various segments of the automotive industry challenging the Administrator's regulations.[2] After careful study of the statute, the legislative history, and the record, we find that the Administrator's regulations reasonably construe the statute, save in one respect.[3] Therefore, we affirm the performance warranty regulations in their entirety, except as they apply to uncertified parts.
 
 I. BACKGROUND
 
 3
 In 1970 Congress substantially amended Title II of the Clean Air Act, 42 U.S.C. Secs. 7521 et seq. (Supp. V 1981),[4] to ensure that motor vehicles would maintain compliance with emission standards throughout their useful lives.[5] As part of this new enactment,[6] Congress established a performance warranty program which would require vehicle manufacturers to repair, at no cost to the owner, any vehicle that failed to comply with applicable emission standards during the vehicle's useful life.[7] See 42 U.S.C. Sec. 7541(b). Vehicle manufacturers would be liable whenever vehicle owners were subject to sanctions because their vehicles had failed state and local emission inspection and maintenance (I/M) tests.[8] In this fashion the performance warranty program serves as an essential component of Congress' comprehensive regulatory scheme to reduce the nation's air pollution.[9]
 
 
 4
 In the 1970 amendments to the Act, Congress did not consider that an extended performance warranty might have anticompetitive effects on the automotive aftermarket parts industry.[10] In 1974, however, a subcommittee of the House Permanent Select Committee on Small Business conducted extensive hearings on the monopolistic tendencies of the performance warranty provisions. This subcommittee found that the five-year/50,000-mile warranty provisions could harm the automotive aftermarket parts industry if vehicle manufacturers were to condition their warranties on use of their own parts and services or if vehicle owners were to perceive some benefit under the warranty from exclusive use of original equipment parts and repair facilities. Either circumstance, the subcommittee concluded, could create "a psychological and financial tie-in between the new carowner and the vehicle manufacturer's parts and franchised service outlets for 5 years and 50,000 [miles]" that might drive independent parts manufacturers out of the industry, leaving vehicle manufacturers with a monopoly on repair parts. Monopolistic Tendencies of Auto Emission Warranty Provisions, Report of Subcommittee on Environmental Problems Affecting Small Business, House Permanent Select Committee on Small Business, H.R.Rep. No. 93-1628, 93d Cong., 2d Sess. 30 (1974), Joint Appendix (JA) 547. To combat these tendencies, the subcommittee advised EPA to "[p]ursue all administrative remedies [that would] minimize the anticompetitive effects of the warranty," and recommended that Congress consider reducing the period of the warranty to 12 months or 12,000 miles, the normal commercial warranty for new cars at that time. Id. at 33, JA to No. 81-1047 at 217. Reducing the length of the warranty, the subcommittee concluded, would reduce the potential for development of any psychological or financial ties between vehicle owner and manufacturer. Id.
 
 
 5
 EPA was, however, without statutory authority to undertake an effective program,[11] and Congress could not reach agreement on what measures to enact.[12] Finally, in 1977, Congress did act to offset the potential anticompetitive effects of the performance warranty. First, it prohibited vehicle manufacturers from voiding warranties for use of aftermarket parts "certified" as equivalent to original equipment parts, 42 U.S.C. Sec. 7541(b)(2), and provided a $10,000 penalty against those manufacturers who conditioned their warranty coverage upon the use of original equipment parts. Id. Sec. 7522(a)(4)(C).[13] Second, Congress limited the scope of the performance warranty after the first 24 months or 24,000 miles so that it applied only to certain emission control parts. Id.[14] Finally, Congress expanded the Administrator's authority to regulate the manufacturers' instructions for vehicle maintenance and use, id. Sec. 7541(c)(3),[15] and added Section 207(g) to require vehicle owners "to replace and to maintain, at [their] expense * * *, [vehicle components which are] related to emission control (but are not designed for emission control * * * ) * * *." Id. Sec. 7541(g).
 
 
 6
 Following passage of these amendments, the Administrator attempted to implement the revised performance warranty program. Though extensive comments had already been received and proposed regulations already promulgated, see 42 Fed.Reg. 26759 (May 25, 1977), JA 001, the Administrator issued a second notice of proposed rulemaking so that interested persons could more fully comment on the effects of the 1977 amendments on the performance warranty program. See 45 Fed.Reg. 6960 (January 31, 1980), JA to No. 80-1829 at 062. After receiving and considering extensive comments the Administrator concluded that "short tests," as well as the equipment and facilities needed to perform such tests, were "available." 45 Fed.Reg. 34802, 34840 (May 22, 1980), JA 410, 482. On May 22, 1980, having made these statutorily required findings, see 42 U.S.C. Sec. 7541(b), the Administrator promulgated the final emission warranty regulations. 45 Fed.Reg. 34829, JA 409.
 
 
 7
 These final warranty regulations include sundry provisions that greatly expand the vehicle manufacturers' responsibilities for post-sale emissions control. See 45 Fed.Reg. 34802-34843 (May 22, 1982), JA to No. 80-1829 at 224-266. For example, the regulations stipulate that for the first 24 months or 24,000 miles, whichever comes first, vehicle manufacturers must warrant all components that affect vehicle emissions. 40 C.F.R. Sec. 85.2103 (1982). Then, for the remaining useful life of the vehicle,[16] the regulations require the manufacturer to warrant those components installed for the sole or primary purpose of reducing vehicle emissions and to remedy all nonconformities which keep those components from working properly. Id. Sec. 85.2107. In addition, the regulations set forth the requirements for maintenance and use instructions upon which the vehicle manufacturers may condition their warranties. Id. Sec. 85.2102(a)(13). Finally, the regulations prohibit a vehicle manufacturer from denying a warranty claim on the basis that a part certified as equivalent was used, id. Sec. 85.2105(a), or from avoiding any of their warranty responsibilities because of certain acts of their dealers, id. Secs. 85.2104(h)(1), 85.2106(f), 85.2107(d), and 85.2111(b).
 
 
 8
 The Automotive Parts Rebuilders Association (APRA)[17] filed its petition for judicial review of particular aspects of the emissions performance warranty regulations on July 14, 1980. The Automotive Service Industry Association (ASIA) was allowed to intervene by order of this court on August 25, 1980.[18] Finally, on July 21, 1980 the Motor Vehicle Manufacturers Association (MVMA), et al., also sought judicial review of several of the regulations.[19] This court consolidated petitioners' and intervenors' challenges on August 13, 1980.[20]
 
 II. STATUTORY PREREQUISITES TO PROMULGATION
 
 9
 Section 207(b) provides that when the Administrator makes certain findings:
 
 
 10
 (1) he shall establish [short tests] by regulation, and
 
 
 11
 (2) at such time as he determines that inspection facilities or equipment are available for purposes of carrying out [short tests] established under paragraph (1), he shall prescribe regulations which shall require manufacturers to warrant the emission control device or system of each new motor vehicle or new motor vehicle engine to which a regulation under section applies and which is manufactured in a model year beginning after the Administrator first prescribes warranty regulations under this paragraph (2). The warranty under such regulations shall run to the ultimate purchaser and each subsequent purchaser and shall provide that if --
 
 
 12
 (A) the vehicle or engine is maintained and operated in accordance with instructions under subsection (c)(3) of this section,
 
 
 13
 (B) it fails to conform at any time during its useful life * * *, and
 
 
 14
 (C) such nonconformity results in the ultimate purchaser (or any subsequent purchaser) of such vehicle having to bear any penalty or other sanction * * *,
 
 
 15
 then such manufacturer shall remedy such nonconformity under such warranty with the cost thereof to be borne by the manufacturer. No such warranty shall be invalid on the basis of any part used in the maintenance or repair of a vehicle or engine if such part was certified as provided under subsection (a)(2) of this section.
 
 
 16
 42 U.S.C. Sec. 7541(b) (emphasis added). Subsection (c)(3), referred to in Section 207(b)(2)(A), in turn provides that:
 
 
 17
 The manufacturer shall furnish with each new motor vehicle or motor vehicle engine written instructions for the proper maintenance and use of the vehicle or engine by the ultimate purchaser and such instructions shall correspond to regulations which the Administrator shall promulgate. * * *
 
 
 18
 42 U.S.C. Sec. 7541(c)(3) (emphasis added). Section 207(a)(2), referred to at the end of Section 207(b)(2), provides that:
 
 
 19
 In the case of a motor vehicle part or motor vehicle engine part, the manufacturer or rebuilder of such part may certify that use of such part will not result in a failure of the vehicle or engine to comply with emissions standards promulgated under section . Such certification shall be made only under such regulations as may be promulgated by the Administrator to carry out the purposes of subsection (b) of this section. The Administrator shall promulgate such regulations no later than [August 7, 1979].
 
 
 20
 42 U.S.C. Sec. 7541(a)(2) (emphasis added). Petitioners argue that, read together, these provisions require EPA to satisfy four statutory prerequisites before it may impose performance warranty liability on vehicle manufacturers. EPA must: (1) establish vehicle short tests; (2) determine that facilities and equipment exist to administer those tests; and (3) promulgate owner maintenance and use instruction regulations; and (4) promulgate replacement parts certification regulations. Petitioners concede that EPA has met the first two requirements, but claim that EPA's failure to promulgate timely[21] parts certification regulations and any maintenance and use instruction regulations renders the performance warranty program unenforceable.[22] This argument, however, misreads the plain language of the statute.
 
 
 21
 On its face, Section 207(b) imposes two specific prerequisites to performance warranty regulation promulgation: the establishment of short tests and the determination that facilities and equipment exist to administer those tests. 42 U.S.C. Sec. 7541(b)(2). Once these specific prerequisites are satisfied, the statute commands that the Administrator "shall prescribe regulations which shall require manufacturers to warrant [their cars] * * *." Id. The statutory directive is straightforward: once the Administrator makes the required findings, he must issue applicable regulations. This is precisely what the Administrator did when he promulgated regulations applicable to all model year 1981 and subsequent model year vehicles.[23]
 
 
 22
 Section 207(b) does, as petitioners assert, make reference to parts certification regulations. It states that no performance warranty shall be invalid on the basis of a part certified under Section 207(a)(2), and Section 207(a)(2) requires the Administrator to promulgate certification regulations "to carry out the purposes" of the performance warranty program. But neither Section 207(a) nor Section 207(b) directly makes promulgation of the certification regulations a prerequisite to promulgation of the performance warranty regulations. By contrast, Congress did set out other specific prerequisites in Section 207(b); Congress easily could have included the certification regulations in this list had it intended them to be necessary prerequisites as well. Indeed, viewing the certification program as an absolute prerequisite to the performance warranty program does not make practical sense: The absence of certification regulations does not change the rights or obligations of any party--vehicle manufacturers, parts manufacturers, or vehicle ownersWIth respect to the performance warranty.[24] No vehicle manufacturer can incur performance warranty liability due to the use of certified parts until certification regulations are promulgated and parts manufacturers actually begin certifying their parts; likewise, parts manufacturers are still free to sell, and vehicle owners free to buy, uncertified parts until such regulations exist.[25] Petitioners would have us read the statute so as to require a meaningless prerequisite that would serve no rational purpose. This we cannot do.
 
 
 23
 Petitioners also argue that Section 207(b) requires EPA to promulgate new maintenance and use instruction regulations prior to promulgating performance warranty regulations.[26] Maintenance and use instruction regulations have been codified at 40 C.F.R. Sec. 86.079-39 (1982), but these existing regulations were promulgated in accordance with the original "reasonable and necessary" language of Section 207(c)(3).[27] The 1977 amendments altered the statute to provide that maintenance and use instructions "shall correspond to regulations which the Administrator shall promulgate," 42 U.S.C. Sec. 7541(c)(3), and petitioners assert that the performance warranty regulations did not correspondingly change the standard for maintenance and use instructions. In fact, all the Administrator did in the performance warranty regulations was reaffirm that the "reasonable and necessary" standard still applied, see 40 C.F.R. Sec. 85.2102 (1982); 45 Fed.Reg. 34831 (May 22, 1980), and reserve the right to promulgate additional regulations.[28] Id. But the Administrator was not required to do more. A viable set of maintenance and use instruction regulations is necessary to implement the statute, but nothing in the statute or its legislative history indicates that Congress thought the existing regulations were inadequate. All the 1977 amendment did was give the Administrator more authority to regulate maintenance and use instructions; it did not condition the viability of the performance warranty on a change in those regulations. The "reasonable and necessary" standard adequately instructs manufacturers as to the preparation of maintenance and use instructions. All parties potentially affected by the maintenance and use instruction regulations have been and are now aware of their rights and obligations under this standard, and any claims of uncertainty are therefore totally unwarranted.[29]
 
 III. SCOPE OF THE PERFORMANCE WARRANTY
 
 24
 Section 207(b) requires the vehicle manufacturers to warrant the "emission control device or system" of each vehicle for its full useful life. 42 U.S.C. Sec. 7541(b). However, the Act limits the meaning of the term "emission control device or system" after the first 24 months or 24,000 miles. Id. Accordingly, the performance warranty regulations define the warranty's scope differently for the periods before and after 24 months or 24,000 miles.
 
 A. Pre-24 Months/24,000 Miles
 
 25
 EPA's emission performance warranty regulations provide that for the first 24 months or 24,000 miles:
 
 
 26
 (a) The manufacturer's obligation under the emission performance warranty shall be to make all adjustments, repairs or replacements necessary to assure that the vehicle complies with applicable emission standards of the U.S. Environmental Protection Agency, that it will continue to comply for the remainder of its useful life (if proper maintenance and operation are continued), and that it will operate in a safe manner. The manufacturer shall bear all costs incurred as a result of the above obligation * * *.
 
 
 27
 40 C.F.R. Sec. 85.2107(a) (1982). Petitioners claim that EPA exceeded the authority Congress granted it by requiring, in this regulation, that vehicle manufacturers warrant all components affecting emissions for the first 24 months or 24,000 miles. But we think EPA's regulation is a perfectly reasonable interpretation of the statute.
 
 
 28
 When EPA first proposed the warranty regulations, in March 1977, it suggested that the performance warranty cover "any system, assembly, device, or other component thereof which can affect emissions." 42 Fed.Reg. 26761 (May 25, 1977), JA to No. 80-1829 at 20. The aftermarket parts industry reacted adversely to this suggestion because such broad warranty coverage might well leave vehicle manufacturers with a monopoly in the aftermarket parts market.[30] Congress agreed, but rather than uniformly reducing the warranty's scope, it responded by limiting the warranty's coverage after the first 24 months or 24,000 miles.[31]
 
 
 29
 Petitioners offer a different interpretation of the statute than does EPA. They argue that Section 207(b) places the more limited burden on manufacturers to warrant only those components that are "integral," as opposed to "related," to emission control. Joint brief of petitioners and intervenor at 36. They derive this interpretation from Section 207(g), which provides that
 
 
 30
 the owner of any motor vehicle or motor vehicle engine warranted under this section is responsible in the proper maintenance of such vehicle or engine to replace and to maintain at his expense * * *, such items as spark plugs, points, condensers, and any other part, item, or device related to emission control (but not designed for emission control under the terms of the last three sentences of subsection (a)(1)[32] of this section, unless such part, item, or device is covered by any warranty not mandated by this Act.
 
 
 31
 42 U.S.C. Sec. 7541(g). According to petitioners, the Administrator's interpretation of the warranty provision would render Section 207(g) meaningless while their interpretation would not.
 
 
 32
 But petitioners read Section 207(g)'s scope and intended purpose too broadly. That section is designed to deal only with who is responsible for performing "scheduled maintenance"--that maintenance which the vehicle manufacturer designates as necessary for the proper performance of the vehicle.[33] If an owner does not maintain his vehicle properly, the manufacturer is free, under Section 207(g), to deny emission performance warranty coverage. But if the vehicle fails an I/M test for other reasons--for example, if components mentioned in Section 207(g) fail prior to the end of their standard design life--then the performance warranty properly covers them during the first 24 months or 24,000 miles. Section 207(g) addresses only the scope of the emission warranty coverage as it relates to scheduled maintenance, and not to services performed and parts replaced under a valid warranty claim.
 
 
 33
 Petitioners' proposed interpretation of Section 207(b) would read the 24-month/24,000-mile limitation right out of the statute. Under petitioners' reading the vehicle manufacturers are responsible only for components "integral" to emission control. But these are precisely the components that are specified in Section 207(b)(2) as covered for the period after 24 months or 24,000 miles.[34] Thus, if petitioners are correct, the performance warranty would cover the same components both before and after 24 months or 24,000 miles. Such a conclusion is incompatible with congressional intent. Congress intended for the warranty coverage to differ before and after the first 24 months or 24,000 miles. The Administrator's interpretation of the statute, not petitioners', properly implements that intention.
 
 B. Post-24 Months/24,000 Miles
 
 34
 Because Congress was also deeply concerned with the anticompetitive effects such broad warranty coverage might have on the aftermarket parts industry,[35] it substantially contracted the vehicle manufacturers' responsibility after the first 24 months or 24,000 miles to cover the "catalytic converter, thermal reactor, or other component installed * * * for the sole or primary purpose of reducing vehicle emissions." 42 U.S.C. Sec. 7541(b). EPA's regulations similarly limit the manufacturers' responsibilities after the first 24 months or 24,000 miles to cover only "those nonconformities resulting from the failure of components which have been installed in or on the vehicle for the sole or primary purpose of reducing vehicle emissions * * *." 40 C.F.R. Sec. 85.2103(a)(3) (1982). But in defining the remedy that would make this warranty effective, EPA also makes the manufacturer responsible for:
 
 
 35
 All other components which must be adjusted, repaired or replaced to enable a component repaired or replaced under paragraph (a)(1) of this section to perform properly.
 
 
 36
 40 C.F.R. Sec. 85.2107(a)(2) (1982).[36] Petitioners claim that this remedy goes beyond the remedial power Congress has authorized and assert that the net result will be to reduce, not increase, competition in sales of aftermarket repair parts.
 
 
 37
 We think EPA's interpretation is consistent with the statute, and therefore should be upheld. If the warranty is to mean anything, it must cover secondary parts which fail because of a failed primary part.[37] Similarly,
 
 
 38
 [i]t makes no sense to replace a failed part, such as a catalyst, which fails as a result of a second component, such as a spark plug, and not to replace the second component to prevent the replaced part from failing promptly for the same reason its predecessor did.
 
 
 39
 45 Fed.Reg. 34837 (May 22, 1980), JA 417.[38] No emission control device operates in a vacuum, and often mere replacement of a device or system will not be enough to prevent a vehicle from polluting.[39] Congress previously confronted this dilemma and left it to EPA to determine what repairs would be necessary to make the performance warranty an effective component of its comprehensive pollution control program.[40] 0] While Congress wanted EPA to reduce the anticompetitive effects of the warranty after 24 months or 24,000 miles,[41] it did not intend for EPA to render the warranty obligation completely meaningless. Congress understood the distinction between the scope of the warranty and the scope of necessary repairs,[42] and EPA has properly implemented this congressional understanding by requiring all repairs necessary to make parts installed primarily for emission control work effectively.[43]
 
 
 40
 Furthermore, EPA has responded--and we think adequately--to criticisms that this expansive repair obligation is inconsistent with the goal of reducing the anticompetitive potential of the performance warranty. First, EPA quite reasonably indicated that the lack of warranty coverage, in all likelihood, would not benefit the independent aftermarket parts industry.[44] 45 Fed.Reg. 34838 (May 22, 1980), JA 418. Second, it indicated that the provision could be "procompetitive" if it discouraged warranty outlets from performing unnecessary repairs, and thus fraudulently increasing their sales. Id. Both responses are theoretically plausible ones, and they indicate that EPA has properly considered and responded to claims that its regulation is inconsistent with the thrust of the 1977 amendments. We therefore affirm.[45]
 
 C. The Parts List
 
 41
 At the time EPA published the performance warranty regulations, it also published, as an appendix, a list advising the public of which parts it believed were "installed in or on a vehicle solely or primarily for the purpose of reducing vehicle emissions, except those components which were in general use prior to the model year 1968."[46] 45 Fed.Reg. 34842, 34843 (May 22, 1980), JA 422-423. The list was explicitly advisory,[47] and neither expanded nor narrowed the legal obligations of any party. The list was merely EPA's attempt to be responsive to industry's request for guidance in the area.[48]
 
 
 42
 Petitioners complain that EPA issued its parts list without giving prior notice and opportunity for comments to the public; accordingly, they suggest that this court vacate the parts list and remand it to EPA for a full rulemaking proceeding. But rulemaking procedures are not required here. Section 307(d)(1)(N) of the Clean Air Act states that rulemaking procedures are not necessary for rules or circumstances qualifying for exemption under Section 553(b) of the Administrative Procedure Act.[49] That section specifically exempts general statements of agency policy--like this nonbinding parts list--from normal rulemaking procedures.[50] Hence, petitioners' procedural complaint is groundless.
 
 
 43
 Petitioners also make general challenges to the substance and length of the parts list. But they do not assert any specific grievances, nor do they indicate how this advisory parts list burdens them in any way.[51] Since 40 C.F.R. Sec. 85.2103 (1982) continues to be the exclusive source for all warranty obligations, we can find no legal basis upon which to upset the parts list. Vehicle manufacturer obligations derive from the Act and its implementing regulations, not from this advisory list.
 
 IV. MANUFACTURERS' OBLIGATIONS EXTENDED
 
 44
 Besides defining which of the vehicle manufacturers' parts must be warranted, the regulations require the manufacturer to take responsibility, at least in the first instance, for short test failures that result from their dealers' acts and from the use of their competitors' parts. Petitioners challenge various aspects of these regulations as exceeding EPA's statutory grant of authority.
 
 A. Liability for Dealers' Acts
 
 45
 To begin with, petitioners challenge the sundry regulations that hold vehicle manufacturers responsible for ensuring that warranty repairs are properly and timely made. These regulations require vehicle manufacturers to honor warranty claims, valid or not, if the repair facility does not finish or reject (in writing) such claims within 30 days. See 40 C.F.R. Secs. 85.2106(f), 85.2107(d) (1982). Similarly, they prohibit vehicle manufacturers from denying claims on the basis of any work performed by an authorized facility, id. Sec. 85.2104(h), and subject these manufacturers to fines of up to $10,000 per offense for warranty work that cannot reasonably be expected to allow the vehicle to meet applicable emission standards, id. Sec. 85.2111(b).
 
 
 46
 In our view, these regulations simply ensure that vehicle manufacturers assume the responsibilities the Act places upon them. In Section 207(b) Congress identified the vehicle manufacturer as being responsible for a broad performance warranty. 42 U.S.C. Sec. 7451(b). In Section 203(a)(4)(D) Congress prohibited these manufacturers from failing or refusing to comply with the terms of the warranty with respect to any vehicle. Id. Sec. 7522(a)(4)(D). And in Section 207(d) Congress specifically prohibited such manufacturers from transferring any of their warranty cost to their dealers. Id. Sec. 7541(d). In these sections of the statute Congress made clear that it wanted vehicle manufacturers to assume full responsibility for the performance warranty. The regulations implement this congressional intent. They do not impose vicarious liability on the vehicle manufacturers or make them responsible for activities they cannot control. Rather, they ensure that the vehicle manufacturers will not be able to escape their performance warranty obligations by delegating the repair work to others.[52] So long as vehicle manufacturers choose to authorize others to perform their obligations, they must also be prepared to accept responsibility for the inadequate performance of their delegates.[53] These regulations simply ensure that consumers do not face unreasonable hurdles in bringing their warranty claims and that, when performed, the performance warranty work is adequate.[54] The Act clearly gives EPA authority to make the vehicle manufacturers responsible for their authorized dealers' acts.
 
 B. Liability for Competitors' Parts
 
 47
 In addition to ensuring that vehicle manufacturers remain responsible for warranty service provided by their authorized dealers, EPA attempted to implement Congress' mandate, in Section 207(b), that vehicle manufacturers not be allowed to deny warranty claims where a competitor's certified replacement part was used.[55] In this effort EPA published "replacement part" regulations, which provide, in pertinent part:
 
 
 48
 (a) No emission performance warranty claim shall be denied on the basis of the use of a properly installed certified part in the maintenance or repair of a vehicle.(b) Except as provided in Sec. 85.2104(h), a vehicle manufacturer may deny an emission performance warranty claim on the basis of an uncertified replacement part used in the maintenance or repair of a vehicle if the vehicle manufacturer presents evidence that the uncertified replacement part is:
 
 
 49
 (1) Either defective in materials or workmanship, or not equivalent from an emissions standpoint to the original equipment part; and
 
 
 50
 (2) The owner is unable to rebut the evidence. * * *
 
 
 51
 40 C.F.R. Sec. 85.2105(a) & (b) (1982) (emphasis added).[56] These regulations thus make the vehicle manufacturers responsible, at least in the first instance, for all warranty claims arising from use of their competitors' parts.
 
 1. Uncertified parts
 
 52
 Petitioners first challenge that aspect of the replacement parts regulations that makes the vehicle manufacturers responsible for warranty claims in which uncertified parts were used in the maintenance or repair of the vehicle. This portion of the regulations effectively shifts the parts manufacturers' burden of demonstrating equivalency--a prerequisite to certification--to the vehicle manufacturers when an uncertified part is alleged to have been relevant to the vehicle's failure to comply with the emission standards.[57] Petitioners claim that EPA reaches beyond its statutory authority in forcing them to carry this burden of proof before they may deny a warranty claim. We agree.
 
 
 53
 On its face, Section 207(b) prohibits vehicle manufacturers from denying warranty claims if certified parts were used in a vehicle's repair. 42 U.S.C. Sec. 7541(b). The statute says nothing about requiring vehicle manufacturers to accept warranty claims where uncertified parts were used, or of requiring vehicle manufacturers to demonstrate that uncertified parts were defective or not equivalent to original equipment parts before a claim can be denied. Indeed, the fairest implication from the language of the statute is that if an uncertified part is relevant to the failure to comply with the emission standards, then the manufacturer may deny the warranty claim.
 
 
 54
 When Congress was considering Section 207(b), it obviously was aware of existing law that governed the vehicle manufacturers' responsibilities to consumers.[58] That law--the Magnuson-Moss Act, 15 U.S.C. Sec. 2301 et seq. (1982)--specifically prohibits manufacturers from conditioning their warranties on the consumers' use of articles identified by brand, trade, or corporate name. Id. Sec. 2302(c). But that law did not prohibit manufacturers from conditioning their warranties on the use of the equivalent of original equipment parts because Congress recognized that the manufacturers' reputation and customer goodwill were at stake in warranty work and that manufacturers should be able to protect their interests by requiring reputable and effective repairs. Cf. id. Sec. 2307 (manufacturer can designate facilities for performing warranty repairs).
 
 
 55
 Congress faced this same concern when it addressed the performance warranty issue under the Clean Air Act. It recognized that the performance warranty exposed vehicle manufacturers to
 
 
 56
 such vast liability that these companies have a legitimate interest in limiting the scope of their liability by conditioning the validity of their performance warranties on the proper care and maintenance of the vehicle. * * * [T]his interest carries with it the ability to establish criteria to protect the vehicle manufacturer from liability which it, in no way, caused, but which resulted solely from the owner's negligence or the installation of independently produced inferior parts or improper nonfranchised service.
 
 
 57
 [Congress further recognized] the legal and economic considerations[,] as well as the inability to establish effective quality control measures [, which] prohibit the vehicle manufacturer from publicly identifying non-OEM equivalent parts and nonfranchised service outlets. * * *
 
 
 58
 H.R.Rep. No. 93-1628, supra, at 30, JA 547 (emphasis added).
 
 
 59
 Thus Congress enacted a scheme whereby EPA was to shoulder responsibility for establishing the criteria for equivalency--the parts certification scheme. Congress was concerned that vehicle owners, because of the duration of the warranty, would use only original equipment parts in maintenance or repair of their motor vehicle emission systems in order to avoid disputes about the "equivalence" of their parts. Congress feared that these psychological and financial incentives would adversely affect the competitive position of aftermarket parts manufacturers.[59] It therefore directed EPA to establish a system whereby all parts manufacturers could, through a relatively simple and inexpensive procedure,[60] certify that their parts were equivalent" to those of the vehicle manufacturer.[61] See 42 U.S.C. Sec. 7541(a)(2). This system was to become effective within two years. Id. Thus, if a vehicle owner had installed a certified aftermarket part, the vehicle manufacturer could no longer assert that the part was not "equivalent" and so refuse to honor the owner's warranty repair claim. But at no time did Congress indicate it wanted vehicle manufacturers to bear the burden of proving nonequivalence for parts not so certified.[62]
 
 
 60
 To the contrary, Congress understood what a delicate task it had assumed in balancing the needs of vehicle manufacturers, parts manufacturers, and consumers. It clearly wanted to mitigate the potential anticompetitive impact of the performance warranty on parts manufacturers and, to that end, directed EPA to establish a certification scheme that would minimize the warranty's anticompetitive impacts. But this scheme also sought to provide certain quality control assurances to both vehicle manufacturers and consumers about the equivalency of independent manufacturers' parts. Thus EPA had to establish a scheme whereby parts manufacturers could establish such equivalency. 40 C.F.R. Sec. 85.2105(a)(2) (1982) undermines this balance by shifting to the vehicle manufacturers the responsibility for establishing nonequivalency, thereby making them potentially liable for aftermarket parts that have not been processed and checked through EPA's certification scheme. The regulation clearly exceeds EPA's statutory grant of authority and must be invalidated.[63]
 
 2. Certified parts
 
 61
 Petitioners further challenge that aspect of the "replacement parts" regulations that prohibits vehicle manufacturers from denying a performance warranty claim on the basis that a certified part was defective, decertified, or otherwise not equivalent to the original equipment part. Joint brief of petitioners and intervenor at 21; see 40 C.F.R. Sec. 85.2105(a) (1982); 45 Fed.Reg. 34840, JA 420; 40 C.F.R. Sec. 85.2121(f) (1982); 45 Fed.Reg. 78462 (Nov. 25, 1980), JA 519.[64] We must reject this challenge because EPA's regulations track the clear language of the statute[65] and fulfill the overriding purpose of the parts certification program.[66]
 
 
 62
 Section 207(b) flatly prohibits invalidation of any performance warranty "on the basis of any part used in the maintenance or repair of a vehicle or engine if such part was certified * * *." 42 U.S.C. Sec. 7541(b). By its very terms, this provision covers any part that is certified, and there is no indication whatever that Congress meant to create any exception for defective, decertified, or nonequivalent parts.[67] To the contrary, Congress wanted to protect consumers from being caught in the middle of disputes between vehicle and parts manufacturers and to make it less risky for them to buy less expensive, nonoriginal equipment parts.[68] Consumers would be spared such disputes and encouraged to use independent manufacturers' parts only if the vehicle manufacturers were required to honor all consumers' claims on parts that were certified when bought.[69] For that reason Congress enacted Section 207(b) requiring vehicle manufacturers to honor any claim based on a certified part, whether equivalent or not.[70]
 
 
 63
 Petitioners contend that two other pieces of legislative history--a 1976 House Report[71] and a 1977 House Committee Report[72]--demonstrate that Congress did not intend for the warranty obligation to apply so broadly and that EPA's regulations are contrary to congressional intent. Both of these reports explained that use of a certified part could "not be considered as a basis for voiding the performance warranty, unless the actual part in question [was] proven by the vehicle manufacturer to be defective in workmanship or materials." But neither of the bills these reports accompanied was enacted into law. H.R. 10498 (which the 1976 report accompanied) died in the 1976 Congress.[73] H.R. 6161 (which the 1977 report accompanied) was a starting point for the legislation ultimately enacted, but contained language very different from that actually included in the final bill.[74] In the final version Congress chose the wording offered in S.252,[75] and this Senate bill (and its language)[76] contained no such exception for defective, decertified, or nonequivalent parts.[77]
 
 
 64
 In describing the final compromise, the Conference Committee concluded that "no warranty shall be invalidated by the use of any part certified under regulations promulgated by the Administrator not to result in failure of an engine to comply with emission standards." H.R.Rep. No. 95-564, 95th Cong., 1st Sess. 548 (1977), JA 557. The Committee understood that a certified parts warranty could be invalidated in only one circumstance: where the manufacturer showed that the owner had not performed the required maintenance or repair as set forth in the owner's manual or had abused the vehicle in its operation. Id. Thus the Conference Committee could not have intended that vehicle manufacturers escape initial responsibility for allegedly defective, but certified, parts. Nor could the Committee have intended that vehicle manufacturers escape initial responsibility for nonequivalent or decertified parts, since the very purpose of creating a certification program was to allow consumers to insure against such charges. Thus, EPA's program seems entirely consistent with the Committee's understanding of the final compromise.
 
 
 65
 Petitioners object to EPA's reading of the statute (and the legislative history) because it imposes what they term "vicarious liability" on the vehicle manufacturers.[78] But EPA's interpretation does no such thing. Rather, it merely commands vehicle manufacturers to make or authorize repairs and then to obtain reimbursement from the parts manufacturers. Contrary to petitioners' intimations,[79] this is the only interpretation of the statute that the agency has suggested:
 
 
 66
 [T]he Agency believes that Congress intended that the vehicle manufacturer honor claims involving certified parts, even if the parts are defective, provided the vehicle manufacturer may be reimbursed for the expenses of such activities by the aftermarket part manufacturer.
 
 
 67
 45 Fed.Reg. 34835 (May 22, 1980), JA 415. Furthermore, this interpretation is entirely consistent with Congress' desire to protect consumers from excessive prices and to minimize the difficulties that consumers might face in obtaining their warranted repairs, provided an acceptable reimbursement scheme is in place.[80] Thus we can find no basis for describing EPA's scheme as one that imposes "vicarious liability" or for finding the interpretation inconsistent with congressional intent.
 
 
 68
 Because we find EPA's interpretation of the statute to be a reasonable one, our decisions in Chrysler Corp. v. EPA, 600 F.2d 904 (D.C.Cir.1979),[81] and Amoco Oil Co. v. EPA, 543 F.2d 270 (D.C.Cir.1976),[82] are completely inapposite. Both of these cases involved regulations that imposed liability (without reimbursement) on one party for the acts of another. In each case the court found that EPA lacked statutory authority to do so. See 600 F.2d at 916-917; 543 F.2d at 275-276. By contrast, this case involves a statute that fully authorizes EPA to shift primary liability from one party to another, provided an acceptable reimbursement scheme accompanies the shift.[83]
 
 V. CONCLUSION
 
 69
 Since 1970 Congress has wanted vehicle manufacturers to bear the cost of repairing emission control devices through a performance warranty program. The 1977 amendments were enacted to minimize the anticompetitive effects of the pollution control program. In 1980 the Administrator finally developed the technology to put this program into effect. His regulations make the vehicle manufacturer broadly responsible for repair of emission control parts early in the life of the vehicle, and then shift that responsibility to the vehicle owner as the car ages. Furthermore, the regulations create a simple scheme whereby the manufacturer is primarily liable for repair failures resulting from dealers' acts and competitors' parts, but can then turn to the responsible party for appropriate reimbursement.
 
 
 70
 The driving public has waited over a decade for the implementation of this program, and the success of our nation's mobile-source pollution control program depends, at least in part, on it. EPA has steadily overcome the technological roadblocks that stood in its way, and is now ready to put the performance warranty into effect. We think the regulations it has promulgated effectuate Congress' intent, and therefore, with the exception of the uncertified parts provisions, we affirm EPA's efforts.
 
 
 71
 Affirmed in part and vacated in part.
 
 
 
 [1]
 Aftermarket parts are those replacement parts not installed as original equipment on a new vehicle. The aftermarket parts industry includes over 2,700 independent parts manufacturers and rebuilders, 22,000 warehouse distributors and wholesalers, and more than 420,000 service and retail parts outlets. Joint brief for petitioner and intervenor in No. 80-1788 at 5
 
 
 [2]
 This court has jurisdiction to hear these petitions pursuant to Sec. 307(b)(1) of the Act. 42 U.S.C. Sec. 7607(b)(1) (Supp. V 1981)
 
 
 [3]
 Section 307(d) of the Act requires us to uphold the Administrator's decisions unless they are (1) arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; or (3) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right. 42 U.S.C. Sec. 7607(d). Furthermore, the court may set aside the Administrator's decisions if they were reached "without observance of procedure required by law." Id. Sec. 7607(d)(9)(D)
 
 
 [4]
 Title II deals with air pollution caused by "moving sources," i.e., motor vehicles. Section 202 of the Act, 42 U.S.C. Sec. 7521, authorizes the Administrator to establish emission standards with which motor vehicles must comply during their useful lives. For a thorough review of Title II and its effects, see Currie, The Mobile-Source Provisions of the Clean Air Act, 46 U.CHI.L.REV. 811 (1979)
 
 
 [5]
 See S.Rep. No. 95-127, 95th Cong., 1st Sess. 81 (1977), U.S.Code Cong. & Admin.News 1977, 1077 p. 1159, Joint Appendix (JA) 552. Section 202(d), 42 U.S.C. Sec. 7521(d), provides that the useful life of a motor vehicle is five years or 50,000 miles, whichever comes first. As authorized, the Administrator has revised the definition of useful lives for 1984 and later model years. See 40 C.F.R. Sec. 86.084-2 (1982)
 
 
 [6]
 In addition to the performance warranty program, Congress established programs which would require vehicle manufacturers to warrant their vehicles against design defects, see 42 U.S.C. Sec. 7541(a), and allow the Administrator to order manufacturers to recall vehicles where he determined that a substantial number of a given class or category were in violation of applicable emission requirements, see id. Sec. 7541(c)
 
 
 [7]
 Compliance would be determined by means of an EPA-approved "short test." A "short test" is a simple and inexpensive procedure for determining whether a vehicle would fail a more intricate pre-sale emission control test. The validity of the short tests prescribed under Sec. 207(b)(1) has been upheld in a companion case, Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. Ruckelshaus, 719 F.2d 1159 (D.C.Cir.1983)
 
 
 [8]
 State and local governments establish I/M programs to help ensure compliance with national ambient air quality standards. Many areas of the country, particularly those in and around cities, exceed these standards because of motor vehicle emissions. State and local governments with I/M programs require vehicle owners to have their vehicles tested periodically for compliance with the standards, and impose various fines and sanctions on those owners who do not, within prescribed time limits, fully repair their vehicles. See generally Reitze, Controlling Automotive Air Pollution Through Inspection and Maintenance Programs, 47 GEO.WASH.L.REV. 705 (1979)
 EPA estimates that, by 1985, 68 metropolitan areas will have I/M programs. See Emission Control System Performance Warranty Regulations, "Economic Analysis Update--Spring 1979," JA 48. Twenty-nine state or local governments currently have such programs in effect. See joint brief of amici curiae at 11.
 
 
 [9]
 By shifting the cost of compliance with automotive emission standards from consumer to manufacturer, the performance warranty reduces public opposition to the I/M programs. Joint brief of amici curiae at 11-12. Congress broadly supported the I/M programs as a way to reduce air pollution, and saw the performance warranty as essential to their success. See, e.g., S.Rep. No. 95-338, 95th Cong., 1st Sess. 282 (1977), U.S.Code Cong. & Admin.News 1977, p. 1072. For a discussion of these two programs, see Appleman, The Clean Air Act: Analyzing the Automobile Inspection, Warranty, and Recall Provisions, 10 HARV.J. Legis. 537 (1973)
 
 
 [10]
 See note 1 supra (describing aftermarket parts industry)
 
 
 [11]
 EPA had already published an advance notice of its intention to establish a voluntary parts certification program. In this voluntary certification program, aftermarket parts manufacturers would demonstrate that their parts were functionally equivalent to original equipment parts. See 39 Fed.Reg. 40193 (Nov. 14, 1974), JA 004. The program was to have had four objectives: (1) to identify those parts or components important to vehicle emission performance; (2) to develop standards or guidelines for those parts; (3) to publish the standards or guidelines so that aftermarket parts manufacturers could design and build their parts accordingly; and (4) to allow the parts manufacturers to represent that parts so built were "certified" to EPA standards. But the subcommittee found that the voluntary program would be ineffectual without some statutory amendment. H.R.Rep. No. 93-1628, 93d Cong., 2d Sess. 31 (1974), JA 548
 
 
 [12]
 The amendments finally enacted were similar to provisions that Congress considered, but did not enact, in 1976. For the relevant pieces of legislative material, see H.R. 10498, 94th Cong., 2d Sess. (1976), JA to No. 81-1047 at 218-220; Report of the House Committee on Interstate and Foreign Commerce to accompany H.R. 10498, H.R.Rep. No. 94-1175, 94th Cong., 2d Sess. (1976), JA to No. 81-1047 at 220-221; Report of the Senate Committee on Public Works to accompany S. 3219, S.Rep. No. 94-717, 94th Cong., 2d Sess. (1976), JA to No. 81-1047 at 240-246
 
 
 [13]
 Congress instructed the Administrator to promulgate within two years regulations which would establish a program by which independent manufacturers could assure consumers that their parts were equivalent to original equipment parts. This program was to be called a "certification" program. The validity of the certification regulations that the Administrator ultimately did promulgate are the subject of a companion case in this litigation, see Specialty Equipment Market Ass'n v. Ruckelshaus, 720 F.2d 124 (D.C.Cir. 1983)
 
 
 [14]
 Specifically, Sec. 207(b)(2) limits the performance warranty after the first 24 months or 24,000 miles, whichever comes first, to cover the "catalytic converter, thermal reactor, or other component installed on or in a vehicle for the sole or primary purpose of reducing vehicle emissions." 42 U.S.C. Sec. 7541(b)(2)
 
 
 [15]
 Prior to the 1977 amendments, Sec. 207(c)(3) required vehicle manufacturers to furnish vehicle purchasers with "such written instructions for the maintenance and use of the vehicle or engine by the ultimate purchaser as may be reasonable and necessary to assure the proper functioning of emission control devices and systems." 42 U.S.C. Sec. 1857f-5a(c)(3) (1976). Pursuant to that provision, the manufacturers submitted proposed instructions to the Administrator, and the Administrator advised them whether the proposals satisfied the "reasonable and necessary" requirement. 40 C.F.R. Sec. 86.075-39 (1976). The 1977 amendments eliminated the "reasonable and necessary" language in favor of a requirement that the maintenance and use instructions simply correspond to regulations which the Administrator shall promulgate. 42 U.S.C. Sec. 7541(c)(3) (Supp. V 1981)
 
 
 [16]
 See note 5 supra
 
 
 [17]
 APRA is composed of over 1,000 businesses in the automobile aftermarket parts industry. Brief of petitioners in No. 81-1072 at 4-5
 
 
 [18]
 ASIA is the automotive world's largest and most comprehensive organization. Its membership consists of more than 7,700 independent wholesalers, warehouse distributors, heavy-duty parts and equipment distributors, automotive electric service distributors, and manufacturers and remanufacturers of replacement parts and tools, equipment, chemicals, paint, refinishing materials, supplies, and accessories. Id. at 5
 
 
 [19]
 MVMA represents various vehicle manufacturers in the automotive industry. Joint brief of petitioners and intervenor at i-v
 
 
 [20]
 All parties to this action will be referred to in this opinion as "petitioners."
 
 
 [21]
 The certification regulations were promulgated on November 25, 1980. 45 Fed.Reg. 78448. The statute required that they be promulgated in August 1979. 42 U.S.C. Sec. 7541(a)(2). To date, no parts manufacturer has certified any part. Joint brief of petitioners and intervenor at 15
 
 
 [22]
 More specifically, petitioners claim that the untimely promulgation of the parts certification regulations precludes enforcement of the performance warranty regulations to model year 1981 vehicles. Furthermore, they claim that the statute provides that no warranty obligations are enforceable as to any model year until EPA promulgates new maintenance and use instruction regulations
 Thus petitioners draw a distinction between promulgation and enforcement of the warranty regulations. They claim that while the Administrator may be able to promulgate such regulations in the absence of maintenance and use instruction and certification regulations, he cannot enforce them. Joint brief of petitioners and intervenor at 9-10, 12 n. 10, 14. But this distinction appears nowhere in the statute. Nor is this a case challenging an "enforcement" of the regulations. Thus the action at issue must be the promulgation of the regulations.
 
 
 [23]
 The statute requires the warranty to apply to all vehicles "manufactured in a model year beginning after the Administrator first prescribes warranty regulations * * *." 42 U.S.C. Sec. 7541(b)(2). The regulations were promulgated in 1980, and thus the Administrator had to apply them to 1981 and all subsequent model year vehicles
 
 
 [24]
 Petitioners claim that the untimely promulgation of the performance warranty regulations deprives vehicle owners of their right to notice that manufacturers cannot void warranties where certified parts are used. Joint brief of petitioners and intervenor at 13-15 (discussing 42 U.S.C. Sec. 7541(c)(3)(a)). But petitioners fail to note that notice has been required since 1977, and Congress did not even intend that the certification regulations be promulgated until August 1979. Thus Congress must have intended that owners be receiving this notice prior to the establishment of any certification program. Again, petitioners have failed to show how certification regulations are a necessary prerequisite to the performance warranty regulations
 Petitioners also assert that Congress imposed an August 1979 deadline for promulgation of the certification regulations to ensure that they were implemented prior to or simultaneous with the performance warranty regulations. See id. at 13. But surely if this were Congress' intent, it would have been more straightforward in its approach. The better explanation for the August 1979 deadline is simply that Congress wanted to ensure that the aftermarket parts industry received the benefits of the parts certification program as quickly as possible.
 
 
 [25]
 Actually, parts manufacturers can sell, and vehicle owners can buy, uncertified parts even after the regulations are promulgated. But they do this at risk: parts manufacturers at a risk of losing their competitive status, and consumers at a risk of losing their warranty
 
 
 [26]
 Manufacturers can legally condition their warranties upon consumer compliance with the maintenance and use instructions that are provided. 42 U.S.C. Sec. 7541(b)
 
 
 [27]
 See note 15 supra
 
 
 [28]
 40 C.F.R. Sec. 85.2102(a)(13) (1982) provides:
 "Written Instructions for Proper Maintenance and Use" means those maintenance and operation instructions specified in the owner's manual as being necessary to assure compliance of a vehicle with applicable emission standards for the useful life of the vehicle that are:
 (i) In accordance with the instructions specified for performance on the manufacturer's prototype vehicle used in certification * * *, and
 (ii) In compliance with the requirements of Secs. 86.XXX-38 (as appropriate for the applicable model year vehicle/engine classification), and
 (iii) In compliance with any other regulations promulgated by EPA governing maintenance and use instructions.
 The Administrator explained his intention with regard to such additional instructions in the performance warranty regulations:
 [T]he Agency believes that Congress intended that EPA have greater control over maintenance and use instructions than existed prior to the Amendments. The full extent of that control will be determined through a future rulemaking under section 207(c)(3) of the Act. Until then, the maintenance and use instructions shall be required to be reasonable and necessary to assure vehicle compliance with emission standards, and also not to be more burdensome than those performed during vehicle certification.
 
 
 [45]
 Fed.Reg. 34841 (May 22, 1980), JA 411 (emphasis added)
 
 
 [29]
 Ford Motor Company recommended in its comments to the performance warranty regulations that maintenance and use instructions be only those "specified in the owner's manual as may be reasonable and necessary to assure the proper functioning of the emission control system." Comment of Ford Motor Company, July 6, 1979, Exhibit A at 2, JA 204 (emphasis in original). See also 45 Fed.Reg. 34841 (May 22, 1980), JA 411
 
 
 [30]
 H.R.Rep. No. 95-294, 95th Cong., 1st Sess. 291-293 (1977), JA 573-575; Proposed Amendments to the Clean Air Act of 1977: Hearings on S. 251, S. 252, and S. 253 Before the Subcommittee on Environmental Pollution of the Senate Committee on Environment and Public Works, 95th Cong., 1st Sess. 136 (1977), JA 596 (statement of Marc L. Fleischaker)
 
 
 [31]
 Thus when Senator Muskie introduced the conference bill he reiterated that:
 In the area of performance warranty we have provided for full coverage of the vehicle for 24 months or 24,000 miles. * * *
 
 
 [123]
 Cong.Rec. S13704 (Aug. 4, 1977), JA 588-A
 Indeed, in 1979, when EPA gathered comments on the proposed regulations, some of the petitioners, as well as other commentators, agreed with the Agency's pre-24 months or 24,000 miles interpretation of the statute. See, e.g., Public Hearing on Proposed Rules for Emission Control Performance Warranty, Chicago, Illinois Transcript, May 31, 1979, at 236, JA 331 (statement of Michael Grice) ("This [emission performance] warranty covers the entire vehicle for 24 months or 24,000 miles.").
 
 
 [32]
 This reference to Sec. 207(a)(1) appears to be erroneous. The context and supporting legislative history indicate that the reference should have been to the final sentence of Sec. 207(a)(3), which defines the term "designed for emission control." See S.Rep. No. 95-127, supra note 5, at 80-84, 206, U.S.Code Cong. & Admin.News 1977, pp. 1158-1162, 1285, JA 551-555
 
 
 [33]
 Section 207(g) originated in Sec. 33 of the Senate bill, S.252. The report accompanying this bill states that the provision affects only maintenance of components "scheduled for replacement prior to the expiration of [a vehicle's] useful life." S.Rep. No. 95-127, supra note 5, at 80, U.S.Code Cong. & Admin.News 1977 p. 1158, JA 551
 
 
 [34]
 42 U.S.C. Sec. 7541(b) (after 24 months or 24,000 miles, emission control device or system is defined to be a component installed for the sole or primary purpose of reducing vehicle emissions)
 
 
 [35]
 S.Rep. No. 95-294, supra note 30, at 21, JA 571; see H.R.Rep. No. 95-564, 95th Cong., 1st Sess. 168 (1977), JA 557
 
 
 [36]
 40 C.F.R. Sec. 85.2107(a)(1), referred to in subsection (a)(2) of the same section, provides that the manufacturer shall be responsible for:
 The adjustment, repair, or replacement of those components which have been installed in or on a vehicle for the sole or primary purpose of reducing vehicle emissions, and which were not in general use prior to model year 1968 * * *.
 This subsection tracks the language of the statute and has not been challenged by petitioners.
 
 
 [37]
 As 40 C.F.R. Sec. 85.2107 was first proposed, it would have required vehicle manufacturers to repair, free of charge, all components necessary to the continued performance of a described emission control device or system for the remainder of the vehicle's useful life, even if the emission control device or system was itself unharmed at the time. 45 Fed.Reg. 34837 (May 22, 1980), JA 417. But EPA, in response to criticism generated by public notice and comment, amended 40 C.F.R. Sec. 85.2107 to require vehicle manufacturers to provide remedies, free of charge, only if: (1) a primary part had already failed, and (2) repair of another component was necessary to make repair of the primary part effective. Id. Our view of petitioners' argument might be different had EPA not made this change
 
 
 [38]
 Of course, if the failure of the second part was caused by or resulted from the lack of scheduled maintenance, the vehicle manufacturer could deny the remedial claim of both the primary and the non-primary parts under Sec. 207(g), 42 U.S.C. Sec. 7541(g). See H.R.Rep. No. 95-564, supra note 35, at 168, JA 557; 45 Fed.Reg. 34832, 34838 (May 22, 1980), JA 412, 417. Similarly, if the failure resulted from the use of a relevant but uncertified part, the vehicle manufacturer could deny the entire warranty claim. See 40 C.F.R. Sec. 85.2104(h)(3) (the manufacturer may not deny a claim on the basis that an uncertified part that is not relevant to the failure was used)
 
 
 [39]
 EPA noted that "[i]f such repairs or replacements were not covered by the warranty they might not be performed at all." 45 Fed.Reg. 34838 (May 22, 1980), JA 418. EPA gave several examples of how replacing an emission control device or system might not keep the vehicle from polluting. See id. at 34837, JA 417
 
 
 [40]
 Cf. H.R.Rep. No. 95-294, supra note 30, at 292-293, U.S.Code Cong. & Admin.News 1977, pp. 1371-1372, JA 574-575 (describing difficulty of drawing these lines):
 The second issue relates to the scope of the term "emission control system or device" for the purpose of the section 207(b) performance warranty. One view of this issue holds that the term should be limited to pollution control valves, catalytic converters, and other elements of design or devices the primary purpose of which is to reduce emissions. This narrow construction is rooted in concerns about possible anticompetitive effects of a broader definition. On the other hand, the committee recognizes that spark plug failures, improper air/fuel ratios, spark timing, and many other features may cause a vehicle or engine to exceed emission standards, even though these features are not primarily intended to control emissions.
 Without the technical competence to determine for itself which features of automotive design could adversely affect emissions and which ones could not, the committee decided not to place a restrictive definition on the term "emission control system or device" at this time. * * *
 
 
 [41]
 Thus the vehicle manufacturer is not responsible for repairing parts that were not installed primarily to reduce emissions if those parts alone caused the vehicle to fail an I/M test. See notes 37 & 38 supra
 
 
 [42]
 Senator Muskie appreciated the distinction between the scope of the warranty and the scope of necessary repairs when he stated:
 Further, the performance of emission control devices or systems, i.e. components installed on or in a vehicle for the sole or primary purpose of reducing vehicle emissions, would be warranted for 5 years or 50,000 miles. If failures of such devices or systems cause a vehicle to fail an inspection test during this time, the manufacturer would again be responsible for the repair of the car unless he could show the cause of the failure to be improper maintenance or use.
 
 
 [123]
 Cong.Rec. S 13704 (Aug. 4, 1977), JA 588-A (emphasis added)
 
 
 [43]
 Petitioners also argue that the regulation is invalid because it requires vehicle manufacturers to pay for repair of parts that "relate" to, but are not "designed" for, emission control, citing Sec. 207(g) as making the vehicle owner responsible for such parts. But, as previously noted, Sec. 207(g) applies only to scheduled maintenance. Thus petitioners' argument begs the question of who is responsible for failed parts that "relate" to emission control on cars that are properly and routinely maintained. The statute answers this question with its 24-month/24,000 miles dividing line: before 24 months/24,000 miles, the vehicle manufacturer is responsible for their repair; after 24 months/24,000 miles, the vehicle owner is responsible for their repair. But, at all times, the vehicle manufacturer is responsible for warranting and effectively repairing all parts installed primarily to reduce emissions, and this obligation may include the remedy of repairing parts only "related" to emission control as well
 
 
 [44]
 EPA noted that lack of warranty coverage would either discourage owners from having repairs performed or lead, as in the case of warranty coverage, to repairs being performed at the manufacturer's designated outlet. The latter result would occur because consumers are unlikely to inconvenience themselves by having to go to two separate places for repair work. Under either scenario the aftermarket parts industry is not benefitted. 45 Fed.Reg. 34838 (May 22, 1980), JA 418
 
 
 [45]
 See generally Kalaris v. Donovan, 697 F.2d 376, 391 & n. 64 (D.C.Cir.1983)
 
 
 [46]
 As stated in the preamble:
 EPA will not develop [warranted parts] lists through the rulemaking process, but rather will, from time to time, publish in the Federal Register a generic list of parts that it believes should be warranted under the emission performance warranty for the vehicle's full useful life. Such a list, reflecting EPA's current views in this regard[,] is included as an appendix to the regulations promulgated today. * * *
 
 
 [45]
 Fed.Reg. 34832 (May 22, 1980), JA 412 (emphasis added)
 
 
 [47]
 The parts list was prefaced with a note that it would not appear in the Code of Federal Regulations. 45 Fed.Reg. 34832 (May 22, 1980), JA 422
 
 
 [48]
 The Administrator explained that it was not possible to maintain a list through rulemaking because of the time constraints involved in a full rulemaking procedure. These time constraints would prevent newly developed parts from being included in the list. 45 Fed.Reg. 34842, JA 422
 
 
 [49]
 5 U.S.C. Sec. 553(b) (1976)
 
 
 [50]
 Even if the parts list were viewed as an interpretive rule, it similarly would be excluded from the rulemaking procedures set forth in Sec. 307(d) because interpretive rules are also listed in Sec. 553(b). See Citizens to Save Spencer County v. USEPA, 600 F.2d 844, 875, 876 (D.C.Cir.1979)
 
 
 [51]
 Indeed, the parts list is virtually identical to one submitted by petitioner Ford Motor Company. See Comments of Ford Motor Company, July 6, 1979, Exhibit C, JA 222
 
 
 [52]
 Thus it is not necessary to decide whether dealers and others who have been authorized by vehicle manufacturers to perform warranty work are "agents" or "independent contractors." Compare joint brief of petitioners and intervenor at 29-34 with brief of respondent at 53-55. Under either characterization the vehicle manufacturer is responsible for the acts (or omissions) that occur in the performance of the manufacturer's warranty
 
 
 [53]
 Congress rejected arguments, similar to those raised by petitioners, that manufacturers should not be responsible for their delegates' actions when it enacted Sec. 203(a)(4)(D). See Hearings Before the Subcommittee on Health and Environment of the Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. 676, 677 (1977), JA 603, 604 (statement of Ford Motor Company in opposition to this section)
 
 
 [54]
 45 Fed.Reg. 34833, 34836 (May 22, 1980), JA 413, 416. Having overseen the Sec. 207(a) emission defect warranty for some eight years, the Administrator had good reason to fear for the possible problems consumers would face. 44 Fed.Reg. 23791 (April 20, 1979), JA 018
 
 
 [55]
 42 U.S.C. Sec. 7541(b). This section of the statute provides:
 No such warranty shall be invalid on the basis of any part used in the maintenance or repair of a vehicle or engine if such part was certified as provided under subsection (a)(2) of this section.
 Subsection (a)(2) allows certification only under such regulations as the Administrator may promulgate, and requires the Administrator to promulgate such regulations within two years of the enactment of the section. 42 U.S.C. Sec. 7541(a)(2).
 
 
 [56]
 40 C.F.R. Sec. 85.2104(h)(3) (1982) prohibits a manufacturer from denying a warranty claim for the use of an uncertified part not relevant to the reason the vehicle failed to comply with emission standards
 
 
 [57]
 Petitioners do not challenge 40 C.F.R. Sec. 85.2104(h). See note 56 supra
 
 
 [58]
 See, e.g., S.Rep. No. 95-127, supra note 5, at 69
 
 
 [59]
 See, e.g., S.Rep. No. 95-127, supra note 5, at 82-83, JA 553-554. For further discussion of this problem, see notes 10-12 supra and accompanying text
 
 
 [60]
 H.R.Rep. No. 93-1628, supra note 11, at 30, JA 547
 
 
 [61]
 Congress understood that there was presently "no method by which it can be determined if a non-OEM part is equivalent * * *." H.R.Rep. No. 93-1628, supra note 11, at 17, JA to No. 81-1047 at 212. But it obviously felt EPA could devise one. EPA's justification for shifting the burden of proving nonequivalency to the vehicle manufacturers in the case of uncertified parts was that no certification standards had been established for some parts. 44 Fed.Reg. 23790 (April 20, 1979), JA 017. But this means that EPA is shifting to the vehicle manufacturers responsibility for its failure to develop such tests. This it cannot do
 
 
 [62]
 This is why Senator Stafford claimed that:
 "The owner may seek proper maintenance from the garage or service station of his choice or may perform such work himself. The only requirement is that parts used must be certified. Certification is not by the automaker but under a program [to be] prescribed by EPA * * *."
 A Legislative History of the Clean Air Act Amendments of 1977, 95th Cong., 2d Sess. 772 (Comm.Print 1978), JA 772 (comments of Sen. Stafford).
 
 
 [63]
 Of course, EPA can require the vehicle manufacturer to submit a statement (or other evidence) indicating why the uncertified part was relevant to the vehicle's failure of the emissions test. See note 56 supra. We do not decide what information EPA might permissibly require the manufacturer to submit to support this claim of relevance. Cf. 45 Fed.Reg. 34836 (May 22, 1980), JA 416 (discussing different degrees of information a manufacturer might be required to submit); 16 C.F.R. Sec. 700.10(c) (1982) (under Magnuson-Moss Act warrantor can deny warranty claim if he can demonstrate that the defect or damage was caused by an "unauthorized" part of service)
 Furthermore, the vehicle manufacturers must still comply with information requirements imposed by other statutes like the Magnuson-Moss Act (and its implementing regulations). Nothing in our decision here impinges upon the requirements of those statutes.
 
 
 [64]
 Petitioners incorrectly contend that vehicle manufacturers may not deny claims for improperly installed certified parts. Joint brief of petitioners and intervenor at 21. The regulations clearly permit manufacturers to deny claims for parts that were improperly installed. 40 C.F.R. Sec. 85.2104(g)(2)(ii) (1982); 45 Fed.Reg. 34840 (May 22, 1980), JA 420. This exception to the broad responsibility placed on vehicle manufacturers reasonably balances the need for owner compliance with maintenance and use instructions and the purpose of the program. We therefore find it to be within EPA's statutory authority
 
 
 [65]
 That the plain language of the statute supports EPA's interpretation is evidence that it should be upheld. See Lead Industries Ass'n, Inc. v. EPA, 647 F.2d 1130, 1146-1147 (D.C.Cir.), cert. denied, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980)
 
 
 [66]
 Statutes should be interpreted in a manner that will effectuate the purposes for which they were enacted. See Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 631, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973); FTC v. Fred Meyer, Inc., 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968)
 
 
 [67]
 Where Congress meant for the consumer to bear the cost of repairs, it specifically said so. Thus in Sec. 207(g) it placed the burden of performing scheduled maintenance on the vehicle owner. 42 U.S.C. Sec. 7541(g). See H.R.Rep. No. 95-564, supra note 35, at 548, JA 557. ("The warranty could be invalidated only upon a showing by the manufacturer that the owner did not perform the required maintenance or repair as set forth in the owner's manual or abused the vehicle in its operation.")
 
 
 [68]
 In this effort Congress enacted Sec. 203(a)(4)(C), which prohibits the manufacturer from "directly or indirectly" communicating to any purchaser that the warranty coverage is conditioned on the use of any of the manufacturer's designated parts or services. This section leaves manufacturers free to deny warranty claims where the parts used were defective or nonequivalent. But Sec. 207(b) takes this privilege away from the manufacturers when such defective or nonequivalent parts are certified
 
 
 [69]
 Therefore, Congress rejected EPA's proposed voluntary parts certification program. See note 11 supra. The subcommittee considering that program indicated that:
 The parts certification program merely proliferates the number of warranties without providing any mechanism for adequately determining why the emission control system failed. Thus, should the parts manufacturer dispute the franchised dealer's assertion that the replacement part caused the failure, the consumer is left with no means to resolve the dispute, other than court action which would probably be so time consuming as to be prohibitive.
 H.R.Rep. No. 93-1628, supra note 11, at 31, JA 548.
 
 
 [70]
 As the Senate Committee on Environment and Public Works concluded:
 Implementation of these amendments will enable a consumer to discharge the proper maintenance obligation under section 207 by making a reasonable effort to obtain proper maintenance, as in the use of certified part, without having to counter a charge by the vehicle manufacturer that the nonoriginal equipment part caused the emissions failure. The threat of such conflict might otherwise induce owners to avoid nonoriginal parts in favor of original equipment parts, which are frequently more expensive.
 S.Rep. No. 95-127, supra note 5, at 82, U.S.Code Cong. & Admin.News 1977, p. 1160, JA 553.
 In the hearings the Administrator similarly emphasized that consumers would avoid independent manufacturers' parts if vehicle manufacturers did not have to honor all claims.
 * * * [O]wners would fear that a vehicle manufacturer would merely allege that the part is defective or otherwise improper and deny the claim. This could encourage vehicle owners to use only original equipment parts, contrary to the legislative intent.
 * * *
 * * * [T]his requirement will remove an owner, who is likely to have little or no ability to determine the cause of an emission nonconformity, from the decision and instead allow two knowledgeable parties, the part manufacturer and the vehicle manufacturer, to determine the cause of the emission nonconformity.
 
 
 [45]
 Fed.Reg. 34835 (May 22, 1980), JA 415
 
 
 [71]
 H.R.Rep. No. 94-1175, 94th Cong., 2d Sess. 236 (1976), JA 588
 
 
 [72]
 H.R.Rep. No. 95-294, 95th Cong., 1st Sess. 293-294 (1977), JA 575-576
 
 
 [73]
 H.R. 10498 would have prohibited a vehicle manufacturer from denying a warranty claim "on the basis of any part used in the maintenance or repair of a vehicle or engine if such part was certified * * *." Though the House described this provision as permitting a manufacturer to deny warranty coverage if it could prove that a certified aftermarket part was defective, the Senate committee reviewing the same provision did not. See S.Rep. No. 94-717, supra note 12, at 69-72, JA to No. 81-1047 at 243-246
 
 
 [74]
 The pertinent provision of H.R. 6161 read:
 If any part used in the maintenance or repair of a vehicle or engine is certified as provided in subsection (a)(2), a manufacturer may not claim that the warranty has ceased to be effective with respect to such vehicle or engine by reason of the use of such part.
 JA to No. 81-1047 at 255.
 
 
 [75]
 The Conference Committee indicated that it was adopting the House, as opposed to the Senate, version. H.R.Rep. No. 95-564, supra note 35, at 548, JA 557. But it described the House version as flatly prohibiting invalidation of warranties where certified parts were used, see id. at 547, JA to No. 81-1047 at 235, and the Senate version as also prohibiting invalidation on the basis of the air-conditioning system. Id. We think the reference to the House version was used to distinguish the Senate language referring to air-conditioning systems, which was not included in the final statutory language
 
 
 [76]
 S.252 provided that no warranty "shall be invalid on the basis of any part used in the maintenance or repair of a vehicle or engine if such part was certified * * *." JA to No. 81-1047 at 255. The bill also discussed air-conditioning systems, but this discussion was deleted in the final language
 The Senate Report describing S.252, S.Rep. No. 95-127, supra note 5, at 80-82, JA 551-553, contains strong language indicating that there were to be no exceptions to the flat prohibition in the warranty provision:
 The Committee has taken action to insure that no anticompetitive effect will occur as a result of emissions control warranties under the act.
 * * *
 This amendment, in conjunction with the part certification program, clarified that the burden on the consumer to seek proper maintenance to protect his section 207 warranty coverage is not to be unnecessarily increased by suggesting that maintenance must be sought in particular parts or service establishments. * * *
 
 
 [77]
 Indeed, neither of the House reports mention nonequivalent or decertified parts. They mention only defective parts
 
 
 [78]
 The vehicle manufacturers acknowledge that Congress has the authority to impose vicarious liability. Thus their argument really amounts to a claim that EPA has misconstrued the statute, and that the statute does not authorize this shifting of primary responsibility for warranty repairs
 
 
 [79]
 Petitioners make various assertions that EPA believes that it can impose liability on the vehicle manufacturers without ensuring that they are reimbursed. See, e.g., joint brief of petitioners and intervenor at 24. We cannot find the source from where they divine such intentions. In our view, EPA has only interpreted the statute to authorize the shifting of primary responsibility for warranty repairs, with the warrantor to receive reimbursement for his efforts
 
 
 [80]
 We have reviewed EPA's first attempt to design an acceptable reimbursement scheme and found it wanting. See Specialty Equipment Market Ass'n v. Ruckelshaus, supra note 13. Our approval of this part of the performance warranty scheme is, therefore, conditioned on satisfactory repromulgation of the reimbursement scheme regulations
 
 
 [81]
 Chrysler involved a set of EPA regulations which held truck chassis-cab manufacturers responsible for noncompliance with noise standards resulting from modifications made to the vehicle by subsequent-stage manufacturers
 
 
 [82]
 Amoco involved a set of EPA regulations which held refiners accountable for the negligence of their retail dealers in selling leaded gasoline in place of unleaded gasoline
 
 
 [83]
 Of course, if EPA, on remand in Specialty Equipment Market Ass'n v. Ruckelshaus, supra note 13, determines that a workable reimbursement scheme cannot be designed, it should not take our approval of its scheme here as prohibiting it from offering another interpretation of the statute